UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| DAVID FAULKINGHAM, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 04-86-B-W |
| | ) | |
| PENOBSCOT COUNTY JAIL, et al, | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |

***Recommended Decision on Motion for Summary Judgment***

David Faulkingham brought this action in May 2004, complaining that when he was in segregation at the Penobscot County Jail as a federal pretrial detainee he was not allowed to make phone calls.  He alleges that this denial was an attempt to hamper the defense of his criminal case or to further punish him for a violation of the jail's rules.  In an amended complaint (Docket No. 22) Faulkingham charges the defendants with conspiracy under 42 U.S.C. § 1985 and § 1986 to interfere with his due process rights to communicate with the outside world by phone, mail, and visits by generating false write-ups (on charges later dropped) to keep him in administrative lock-up and by searching his cell and taking his legal and other materials.  The defendants, Penobscot County Jail, Lieutenant Linda Golden, Lieutenant Ty Babb, Corporal Pomeroy, Corporal Downing, Corrections Officer Crain, Corrections Officer Hatch and Sergeant Chris Boulier, have filed a motion for summary judgment.  (Docket No. 36.)   I now recommend that the court grant their motion.

*Discussion*

The defendants are entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and the defendants are "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," id. I review the record in the light most favorable to Faulkingham and I indulge all reasonable inferences in his favor. See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir.2000).

*Material Facts*[1]

According to the defendants, Faulkingham was brought to the Penobscot County Jail on March 19, 2004, (not for the first time) on charges pertaining to the distribution of heroin and a violation of bail conditions. (Defs.' SMF ¶ 3;  Clukey Aff. ¶ 6.) Faulkingham retorts that he was arrested on a federal warrant for which he was to be held without bail until trial.  (Faulkingham Aff. ¶ 3.)[2]

According to the defendants, on April 14, 2004, Faulkingham submitted a grievance indicating that he had filled out four requests for law books, and was still

---

[1]   In their reply memorandum the defendants observe that Faulkingham has filed his affidavit and a declaration, neither of which conform to the pleading requirements of Local Rule 56.  It is evident to me that the affidavit is a paragraph-by-paragraph response to the defendants' statement of material fact and, although there is not a properly labeled companion responsive statement of material fact citing to this affidavit, I have considered each of Faulkingham's affidavit paragraphs vis-à-vis each of the defendants' paragraphs.  With respect to the declaration, I will not treat this pleading as a statement of additional facts as it does not set forth factual statements in a manner that would allow the defendants to respond in a meaningful fashion.

[2]   Faulkingham faults the defendants for relying on the Clukey affidavit, claiming that Clukey had nothing to do with his case and that many of the dates and reasons for being held/bailed are incorrect.

2

asking for the books.  The grievance was responded to on April 15, by Corporal Donna Downing indicating that library was done (which I take to mean this was a day that the inmates had library access) on April 6, 2004, and she did not get the request on that date from Faulkingham.  Downing was out of the office on April 8, 2004, at meetings, and then inadvertently misplaced Faulkingham's request.  The requested book was given to Faulkingham on April 15, 2004.  (Defs.' SMF ¶ 4; Clukey Aff. ¶ 7, Ex. 1.)

Faulkingham qualifies this statement by indicating that the treatment of this request is only a piece of his struggle to get law books at the jail.  (Faulkingham Aff. ¶ 4.) He claims that the defendants would hold documents to prove that he asked for books and that about fifty-percent of the time he did not get the books, copy, paper, pencil, mail, phone access, or visits that he requested.  According to Faulkingham this intransigence on the defendants' part lasted four months, starting April 4, 2004.  (Id.)[3]  He indicates that request to which the defendants point is but one of nearly twenty times that he was denied law books or had them taken away just hours or days after receipt.  (Faulkingham Aff. ¶ 4; Exs. 4-F, 4-G, 4-K, 4-L, 4-M, 4-N, 4-O.)   Faulkingham cites to nine requests that he says were not answered, and provides copies of six request sheets sans his signature on the date returned line.  (Faulkingham Aff. ¶ 4; Exs. 4-A, 4-E, 4-X, 4-W, 4-Z, & 4-2.)[4]

---

[3]      Faulkingham also asserts vis-à-vis this paragraph that out of twenty requests only eleven were answered by allowing Faulkingham to communicate with his criminal lawyers and that communication by phone is the primary way of making this contact.  (Id.)  He argues that he had a right to call around for counsel to represent him in his civil case also.  (Id.)  He contends that an inmate who is in administrative segregation for non-punitive reasons should have phone privileges. (Id.) Faulkingham further adds that while he was in administrative segregation his legal materials and writing supplies -  his stamps, legal books, books, pen, carbon paper, and legal mail -- and other belongings were taken away and never returned. (Id.; see also Ex. 5-10.)  These assertions do not qualify the fact pertaining to his library grievances and are redundant of Faulkingham's response to the facts that pertain to telephone access and the alleged property confiscation.

[4]      He also cites to Exhibits 4-K, 4-M, 4-N but these exhibits were not filed with the court.

According to the defendants, on April 24, 2004, Faulkingham grieved indicating that he had an appointment to call his lawyer at 8:00 p.m. at night (Saturday), and since he was not allowed to use the phone he would be filing lawsuit number three. This grievance was responded to that same day by Sergeant Biermann who noted that he had checked the pass on log and found nothing. Biermann then quoted the jail's policy to Faulkingham, which is that inmates not in good standing will not be allowed access to collect calls of phones located in the day area except as authorized by the shift supervisor or designee for a bona fide reason. Routine lawyer calls do not constitute a bona fide reason. (Defs.' SMF ¶ 5.)[5]  On April 27, 2004, Faulkingham filed a grievance advising the administration that pursuant to the Prisoner's Self-Help Litigation Manual pretrial detainees are entitled to legal calls even when they are in lockdown. This grievance was responded to indicating that access to the phone is a privilege, and because Faulkingham was in disciplinary segregation he had lost this privilege. (Id. ¶ 6.)  On April 28, 2004, Faulkingham filed a three-page grievance covering a number of issues. One of these issues pertained to his access to the telephone, and he was again advised that he was in lockup and that there were no phone calls unless otherwise authorized. (Id. ¶ 7.)

Faulkingham responds that he does not dispute these factual assertions but explains that his beef is with the Penobscot County Jail policy. (Faulkingham ¶ 5.)  He states that, as a prisoner with six criminal cases he was denied his right to call an attorney and that he could not write or receive a visit from an attorney, as suggested by the defendants, because he did not have an attorney to write to or visit with. And, as a consequence of the jail's rule Faulkingham ended up representing himself in six criminal

---

[5]    Neither party has explained why Faulkingham was "not in good standing" at this juncture. The first record evidence for Faulkingham being formally charged with a disciplinary violation points to May 21, 2004.

cases in Hancock County.  (A dilemma that Faulkingham suggests was exacerbated by his problems with the jail's mail system.) (Faulkingham Aff. ¶¶ 5-7.)

According to the defendants, on May 5 (the grievance was dated incorrectly by Faulkingham as April 5), Faulkingham filed a grievance stating that he attempted to get a free stamp for his legal mail.  As a result of Faulkingham not getting his stamp, he advised the jail that lawsuit number three would be prepared that night.  The grievance was responded to by Corporal Chad Young who indicated that he spoke with Faulkingham.  Faulkingham informed Young that he had put one stamp on his mail that needed two stamps.  Since there was a stamp on the envelope, the intake officer mailed out the letter and it was returned.  Young noted that the "inmate understands what happened and resubmitted the letters, and they were stamped and sent out on May 6, 2004.  (Defs.' SMF ¶ 8.)

Faulkingham responds that it is correct that he requested a stamp on May 5, 2004, and put it on a large envelope for mailing.  (Faulkingham Aff. ¶ 8.)  He states that the envelope was sent back to him thirteen days later and (in the meantime) it had been sent out three times by jail personnel without the proper postage.  (Id.)  On May 22, 2004, the envelope was taken away when Faulkingham was put in administrative segregation. (This event is described in greater depth below.)  He never saw any of this property again and he notes that the form inventorying the property does not have Faulkingham's signature in the date returned box.  (Id.; Ex. 5-4.)[6]

According to the defendants, on May 5, 2004, Faulkingham filed a grievance indicating that upon returning from court (for an appearance in Faulkingham's criminal

---

[6]      Faulkingham also references his many attempts to send and receive mail while indigent. (See Ex. 2.)

case(s) in Hancock County), he possessed important legal paperwork which he gave to the corrections officers working in intake. Faulkingham was demanding his legal paperwork back, or an answer as to where the papers were, and indicated that if he was not responded to that day he would file a lawsuit pertaining to the theft of his property. The grievance was responded to by Sergeant Boulier who indicated that Corporal Gardner allowed Faulkingham to take any legal papers from his box that he wanted. According to the defendants Faulkingham made no mention to Gardner of anything else missing. A search of Faulkingham's property proved negative for any other court or legal paperwork and no other officer can remember anything about this. Boulier suggested to Faulkingham that when Faulkingham comes back from court that he should ask for any paperwork he is supposed to get. (Defs.' SMF ¶ 9.)

In his affidavit Faulkingham states that this occasion was the first time that the Penobscot County Jail took his legal documents. He was returning from Hancock County where he had just "played" attorney for himself in his six criminal cases and on return to the jail he had a large amount of legal paperwork. (Faulkingham Aff. ¶ 9.) He asserts that a Penobscot County Jail correctional officer named Rice received the paperwork from a correctional officer at the Hancock County Jail. (Id.) Faulkingham also cites to a memo to Boulier by Rice, stating that on May 3, 2004, when he was working intake Faulkingham came back from court and Rice was given paperwork belonging to Faulkingham and that Rice found the property box and placed the paperwork in his box, closed the lid, and returned to intake. (Defs.' Ex. 12.) Faulkingham further points to a memo from Correctional Officer Estes in which he writes that on May 3, 2004, Faulkingham returned from court and Rice found some paperwork that belonged to him

and that Rice placed the paperwork in Faulkingham's property box in the booking area. (Defs.' Ex. 11.)  With respect to the defendants' representation that Faulkingham made no mention of anything else missing, Faulkingham points out that the only papers missing at that point were those Rice handled; the comments on the grievance form were dated  May 11, 2004 (see Defs.' Ex. 13), and the next incident was May 22, 2004 (see Faulkingham Aff. Ex. 5-1).  With respect to the suggestion that Faulkingham should have asked for the paperwork when he came back from court, he states that the Rice report makes clear that Faulkingham had no possession of the paperwork and that a subsequent grievance by Faulkingham demonstrates that he did ask for his legal paperwork upon his return from Hancock County but was told to sit down and shut up.  (Defs.' Ex. 14.)  Faulkingham also faults the representation in the response to his May 5, 2005, grievance that Corporal Gardner allowed Faulkingham to get his "stuff," (Defs.' Ex. 13) and indicates that Gardner told an officer to allow this but Faulkingham never was allowed to retrieve his papers. (Faulkingham Aff. ¶ 9.)

According to the defendants, on May 11, 2004, Faulkingham filed a grievance pertaining to his May 5, 2004, grievance about the lost or stolen paperwork.  In response to this grievance, it was noted that Corrections Officer Rice placed the paperwork in question in Faulkingham's box on May 5, 2004.   The defendants assert that Faulkingham was allowed to take out of his box anything of a legal nature with the assistance of Corporal Gardner.  Gardner made no mention that Faulkingham stated he was missing anything at the time he was inspecting and taking things out of his box.  As a result, the response to the grievance notes that Faulkingham must have the paperwork.  (Defs.' SMF ¶ 12.)  Also, in response to the May 11, 2004, grievance, Sergeant Boulier asked the

corrections officers (Estes and Rice) working in the intake area on May 3, 2004, to fill out reports.  (Id. ¶ 13.)  Corrections Officer Larry Estes wrote that on May 3, 2004, inmate Faulkingham returned from court, and after Faulkingham went upstairs, Corrections Officer Rice found some paperwork that belonged to Faulkingham. Corrections Officer Rice asked Estes if Faulkingham's property box was down in the booking area.  Estes informed him that it was and that it was Box 222.  Rice then placed the paperwork in the box.  (Id. ¶ 14.)  Rice reported that on May 3, 2004, at approximately 2:15 he was working in intake.  Faulkingham returned from court and Rice was given paperwork belonging to Faulkingham.  Rice remembers asking Estes if they had Box 222 out.  Estes informed Rice that it was out and Rice found the box and placed Faulkingham's paperwork in the box and closed the lid.  (Id. ¶ 15.)

Faulkingham reiterates that Gardner told someone else to let Faulkingham get his materials out of his box (Defs.' SMF Ex. 6 at 2) but that no correctional officer ever let Faulkingham access his papers.  He asserts that he never stated that nothing else was missing.  (Id. ¶ 12.)  He reiterates that Rice's version of the transfer of Faulkingham's legal papers to Rice and then to Box 222 (Defs.' SMF Ex. 12) supports Faulkingham's own version of events.  (Faulkingham Aff. ¶13.)  He argues that he was dressed for court and had to be changed-up into orange clothing after being booked and that his street clothing had to go into Box 222, with an inventory being made.  Therefore, he would have seen the papers and been able to get them out.  (Id.)  Faulkingham states that an inventory of the box was signed by him but never produced by the defendants.  (Id. ¶ 15.) He re-references his May 11, 2004, grievance statement in which he indicates that he did ask for the legal paperwork and was told to shut up and sit down.  (Defs.' SMF Ex. 14.)

He states that Rice's assertion that he put the papers in the box within minutes of his return from Hancock County is inconsistent because it would have taken at least an hour to book, strip, and redress Faulkingham.  (Faulkingham Aff. ¶¶ 13,14.)

   The defendants state that on May 6, 2004, Corporal William Gardner authored a memo in response to a number of conversations with Richard Clukey.  The memo arose out of Richard Clukey's conversation with Faulkingham's attorney, Norman Kominsky. Faulkingham had advised his attorney that he was not getting his mail lately and that the mail Faulkingham was sending out was being returned to him.  Faulkingham also complained that he was not receiving law books and was not being allowed to use the phone. Clukey asked Gardner to meet with Faulkingham to evaluate his concerns and see what Gardner could do for Faulkingham.  (Defs.' SMF ¶ 10.)   According to the defendants, at the meeting between Gardner and Faulkingham, Faulkingham advised Gardner that his biggest concern was not being allowed to use the phone.  Gardner explained to Faulkingham that the phone privileges were limited while he was in disciplinary lockup by policy and Faulkingham advised him that he had filed a lawsuit against the jail regarding depriving him of the phone. On the subject of mail, Faulkingham told Gardner that he was suspicious since he was in lock-up that he was not getting his mail.  Gardner advised Faulkingham that no one was intentionally withholding his mail and stated that it may be just a coincidence and that maybe some people have just stopped writing to him.  With respect to the issue of Faulkingham's mail being returned, Faulkingham advised that he was indigent and that he usually had no problem with his mail being sent out.  Faulkingham explained that a large envelope that he tried to mail out was returned because it needed another stamp.  Faulkingham admitted that this

had been taken care of and Gardner told Faulkingham that if he had any problems with the mail to let him know.  On the subject of law books, Faulkingham advised that this problem had been taken care of that day.  Faulkingham stated that he had a law book taken away from him, but it had been reissued to him and there was no longer any concern.  With respect to legal materials, Faulkingham told Gardner that he had not been allowed to get some of his casework out of his personals and he had been requesting it for a couple of days.  Gardner had an officer allow Faulkingham to get his personals and allowed Faulkingham to look through them and take whatever legal work he needed. (Defs.' SMF ¶ 11; id. Ex. 6; Clukey Aff. ¶ 14.)

With respect to his May 6, 2004, letter to Attorney Kominsky, Faulkingham states that up until that letter he struggled with obtaining phone, mail, and library access and experienced the confiscation of his legal papers.  (Faulkingham Aff. ¶10.)  He relays that he grieved denial of access to the legal library (Faulkingham Aff. Exs. 4-C & 4-D); he grieved the interruption of his legal mail (Id. Exs. 2-1 & 2-2); and he requested the usage of a phone and was told he could not use it (Id. Ex. 1-1).  Faulkingham explains that up until May 6, 2004, he had experienced only a small amount of retaliation but that, as both sides' exhibits demonstrate, "it gets real bad real soon."  (Faulkingham Aff. ¶ 10.) Faulkingham states that he had no meeting with Gardner and that the inter-office memo relied on by the defendants is not a sworn statement.  (Faulkingham Aff. ¶¶ 11, 12.)  He states that Gardner visited his cell and told him that all his troubles were in his head and that was the extent of the contact between the two on this matter.  (Id. ¶ 11.)

There is no dispute that on May 12, 2004, Faulkingham filed a grievance indicating that his lawyer, Wayne Foote, told him that he had sent mail to him on

Monday, and on that day, Wednesday, he had still not received his mail.  The response to the grievance indicates that no legal mail was found on the Deck 2 duty station, and that if Faulkingham's legal mail was available they would get it to him right away.  The grievance was then referred to Sergeants Basso and Biermann who responded that they would not, for any reason, keep Faulkingham's legal mail or any other mail.  If they had received it, he would have gotten it.  (Defs.' SMF ¶ 16; Faulkingham Aff. ¶ 16.)[7]   There is also no dispute that on May 18, 2004, Faulkingham submitted a grievance requesting to meet with Lieutenant Golden about medical treatment and the use of the phone to call his attorney while he was in lockup.  Golden responded indicating that she spoke with Faulkingham that day, and that concerns due to his medical treatment would be reviewed. As to calls to his lawyer, Golden indicated that the jail's records reflect that Faulkingham had never placed a phone call to his attorney during his incarceration, including the time prior to his being placed in lockup.  The records further indicated that he did make calls to his family while he was in lockup.  (Defs.' SMF ¶ 17; Faulkingham Aff. ¶ 17.)[8]

According to the defendants, in an undated grievance, which was responded to on May 20, 2004, Faulkingham indicated that he would like to talk to Sheriff Ross concerning some paperwork that he needed the Sheriff to sign and return to him.  Sheriff Ross, in responding, noted that on May 21, 2004, he spoke with Faulkingham, and told him that he forwarded all legal papers to their attorney, and asked if Faulkingham was all set medically, and Faulkingham indicated that he was and that he was working through his problems with Medical.  (Defs.' SMF ¶ 18.)  Faulkingham replies that he has no recollection of this conversation with Ross.  (Faulkingham Aff. ¶ 18.)

---

[7]      Faulkingham adds that this does not capture the full scope of the mail problem.
[8]      While acknowledging that this statement is correct, Faulkingham for the first time requests a copy of the records showing that he did not call his lawyer.

There is no dispute that on May 21, 2004, Faulkingham filed a grievance in response to Golden's response to his May 18 grievance. Faulkingham indicated that he calls his family to get in touch with his lawyer.  Golden's response was that by failing to follow the rules and regulations, Faulkingham had placed himself in disciplinary segregation, and that status limits his access to the telephone.  (Defs.' SMF ¶ 19; Faulkingham Aff. ¶ 19.)

According to the defendants, on May 21, 2004, Corrections Officer Garth Crain authored a memo indicating that at 9:40 a.m. Faulkingham was brought down to the holding area at the request of Sergeant Boulier. Upon arriving in the holding area, Crain told Faulkingham to bring his blankets into his cell. Faulkingham asked if he could bring in his bible and Crain told him that he could.  Faulkingham then asked if he could bring in his legal work, and Crain again told him that he could. Faulkingham then stated that it could take a long time and Crain told him that that could be figured out later and asked him to get into the holding area.  Crain explains his action as relating to the fact that there were other things going on in the intake area at the same time.  Faulkingham responded to Crain's directive by stating that Crain was trying to screw with him and his lawsuit because he was suing the facility.  Crain told Faulkingham that he had no interest in the lawsuit, and Faulkingham responded that Crain was a "shitbag." Faulkingham then stated that he wanted his legal work under lock and key and that he would be the only one to place it there.  Crain told Faulkingham that the facility did not provide lockers for inmates to lock down their legal paperwork and Faulkingham responded by calling Crain a variety of obscenities.  Crain escorted Faulkingham into the holding cell and Faulkingham proceeded to tell Crain that if he opened the door he was going to kill

Crain. As a result of his conduct Faulkingham was placed in administrative lockup at the request of Sergeant Boulier. (Defs.' SMF ¶ 20.) According to the defendants, on May 23, 2004, Faulkingham filed a grievance indicating that he wanted a hearing regarding his segregation. This grievance was responded to by Linda Golden who indicated that Faulkingham had been placed in administrative segregation for threatening an officer and that his classification had been upgraded accordingly. Faulkingham was currently housed in holding due to a lack of space, and had been removed from administrative segregation as of that date and would be reassigned to housing as space became available, and that his being held in holding had nothing to do with him personally. (Defs.' SMF ¶ 21.)

Faulkingham responds at great length to these representations. He indicates that when he got to the holding cell, a.k.a. "the Hole" or Cell 121, he wanted a reason for his move and no reason was given. (Faulkingham Aff. ¶ 20.) He states that he also asked to have his belongings inventoried and requested that he be able to take his legal materials to his cell but all the requests were denied. (Id.) "The Hole" is considered a high risk cell and no property is allowed in the cell so all his belongings were taken from Faulkingham which upset him. (Id.) He was also upset because he could not be present when his stuff, including his legal papers, was inventoried. (Id.) He states that May 21, 2004, was the starting date of a period of wholesale confiscation of his belongings. With respect to the segregation property sheet, Faulkingham argues that it shows that everything was taken away but that he never witnessed his property when coming in or out of "the Hole." (Id.; Ex. 5-4.) He stayed in this cell from May 22, 2004, through May 25, 2004. (Faulkingham Aff. ¶ 20; Ex. 5-5.) Faulkingham states that he was moved to holding due to a lack of space (Id. Ex. 5-7) and asks the court to keep in mind that his alleged

threatening of Crain took place after this move.[9]   He cites to his exhibits to show that he was on segregation (although he claims he had done nothing) and was housed in J Block in a regular cell on May 21, 2004, at 8:30 to 9:00 a.m. (id. Ex. 5-3) and at 9:40 a.m. he was moved from his J Block cell to "the Hole" by Crain at 9:45 (id. Ex.5-6).[10]   He argues that Crain and Boulier made up a reason to do what had already been done – placing him on administrative segregation -- so that they could put him in "the Hole" and permanently strip him of all his legal work. (Faulkingham Aff. ¶ 20.)   He claims this conduct was repeated on June 17, 2004, when he was wrongly accused of an assault on another inmate (he was defending himself and broke his shoulder), again placed on administrative segregation, and, again, his property was taken without Faulkingham witnessing the inventory. (Id.)  Faulkingham describes Golden's statement as "not true" and suggests that she is part of a conspiracy to retaliate against Faulkingham by putting him in "the Hole," taking his stuff, and stopping his visits, phone usage, and mail.  (Faulkingham Aff. ¶ 21.)

There is no dispute that on June 2, 2004 (at 3:15 p.m.), Faulkingham filled out an inmate request form indicating that he would like to talk to his lawyers by phone. The request was denied, and Faulkingham was advised that the use of the phone for any reason was a privilege not a right and that if he stayed out of lockup he would not lose his privilege.   (Defs.' SMF ¶ 22; Faulkingham Aff. ¶ 22.)[11]

---

[9]   The response to Faulkingham's grievance cited by Faulkingham indicates that while he was moved to holding due to lack of space, his administrative segregation was triggered by his threat to physically harm an officer.  (Id.)
[10]   Faulkingham cites to his Exhibit 5-1 suggesting that it demonstrates that he was placed on administrative segregation for threatening staff at 8:30 to 9:00 a.m. however this exhibit does not have a time of day indicated anywhere on it so it could easily reflect a post-Crain incident determination. Faulkingham does demonstrate that he was on some sort of segregation before the incident with Crain but I cannot draw an inference in his favor that Boulier put him on administrative segregation for threatening an officer before his run-in with Crain.  (See Faulkingham Aff. ¶ 20, Page 11-12.)
[11]   Faulkingham references his memorandum on pre-trial detainees' rights.

According to the defendants, on June 2, 2004, at 3:30 p.m., Faulkingham filed a grievance indicating that while he was at recreation, one of his law books had been taken from his cell. (See Defs.' SMF Ex. 18; Faulkingham Aff. Ex. 4-F.)  Captain Downing responded to the grievance by indicating that the book had been returned and informed Faulkingham that he was no longer responsible for it. She further explained that there are a limited number of books with many inmates requesting them and that Faulkingham could put in a request to use the book again. (Defs.' SMF ¶ 23.)  That same day, at 3:36 p.m., Faulkingham filed a grievance indicating that he had a right to law books, and that he wanted and needed the Inmate Self-Help Litigation Manual.  Downing responded to this grievance by indicating that she had tried to order (presumably additional copies of) this book and had been informed that it is no longer being published. Downing indicated that she had contacted Borders requesting that they contact the publisher to see if there would be a replacement and that they would be getting back to her. Downing also responded to Faulkingham's claim that there were papers in one of the books that was returned by indicating that there were no papers in the book when it was returned to the law library.  (Id. ¶ 24.)

Faulkingham responds that the book in question was the Inmate Self Help Litigation Manual which he requested at least four times between April 4, 2004, and June 2, 2004.  (Faulkingham Aff. ¶ 23; id. Exs. 4-A, 4-C, 4-D, 4-E & 4-F.)  He views Golden's representation vis-à-vis the second June 2, 2004, grievance as disingenuous and insists that the book was taken from his cell with a lot of legal notes and papers;  Faulkingham argues that the reason for taking the book was part of a conspiracy to get this paperwork and stop his legal work. (Faulkingham Aff.¶¶ 23, 24.)

According to the defendants, on June 5, 2004, Faulkingham filed another grievance relating to his missing paperwork, indicating that he had a law book taken from his cell on June 3, 2004, and also questioning whether he could be held responsible for the book. Faulkingham also appeared to be complaining that there was paperwork missing out of his property box.  This grievance was responded to by Downing who indicated that the book was signed-in as "returned" in her computer records and that Faulkingham was not responsible for the book.  Also, with respect to the missing paperwork, Lieutenant Babb wrote a memo to Sergeant Boulier requesting that he look into the part of the Faulkingham grievance regarding the missing paperwork.  Boulier responded by indicating that this was a repetitive grievance about paperwork and that the jail staff had made every attempt to find Faulkingham's paperwork that he claimed was placed in his box.  Gardner had let Faulkingham go through the box and documented such. In response to this memo, Babb responded to Faulkingham by indicating that the second part of his grievance had already been answered and reiterated that Gardner had allowed him to look through is property box when he was first taken out of lockup. The paperwork Faulkingham claimed was missing was not in his property box. (Defs.' SMF ¶ 25.)

Faulkingham responds that his June 5, 2004, grievance makes it very clear that he is missing a book from June 3 and that he was requesting his personal property that was deliberately taken from him when he was put into "the Hole."  (Faulkingham Aff. ¶ 25.) He agrees that his property was not in his box and adds that he has never seen it again. (Id.)  He states that he never signed a law book request returning these volumes (and he did not do so with respect to the book taken earlier that had his legal papers in it).  (Id.)

16

According to the defendants, on June 11, 2004, Faulkingham filed a grievance indicating that he had called his attorneys, Norman Kominsky, at 947-7978, and Wayne Foote at 990-5855, and had been unable to get through to them.  Golden (inaccurately) responded to this grievance by indicating that Faulkingham had access to the phone while he was out for clean-up each morning.  The phone records indicated that he called 947-7978 on June 9, 2004, and talked from 10:22 to 10:25, and on May 27, 2004, he made two calls to 990-5855 for a total of seven minutes.  (Defs.' SMF ¶ 26.)   On June 15, 2004, Faulkingham filed a grievance in response to Golden's answer of the previous grievance indicating that the call on June 9, 2004, was made by another inmate and the call to 990-5855 was made by Faulkingham while out of lockup.  Golden responded that Faulkingham was not denied access to an attorney or the courts, as he has the ability to write to both.  The access and use of the telephone is a privilege.  Further, she noted that attorney calls are not monitored or recorded and claimed that access to the court as it relates to use of the telephone is not constitutionally protected.  (Id. ¶ 27.)   On the same day, at 6:30 p.m., Faulkingham filed a second grievance citing case law about his right to call his attorney and complaining about monitoring his calls to his attorneys.  Golden responded to this grievance by indicating that at no time was the word "monitor" used in response to the grievance.  Attorney calls are not monitored or recorded.  There is a log of all numbers called from the facility and this was not monitoring the call.  (Id. ¶ 28.)  On June 16, 2004, Faulkingham grieved complaining that he could not write his lawyer because he did not have an address, but only had a phone number to call him.  Further, he had no attorney on his Hancock County cases and was required to go without a lawyer because the jail kept him from hiring one by denying him the right to the phone. Golden

responded to this grievance by indicating that inmates in disciplinary lockup can purchase some items and stamps are one of the items which can be purchased. Golden further indicated that she had researched the case law, and other than bail calls at the time of arrest, Faulkingham had no right to use the phone. Faulkingham was allowed visits and to mail letters to access the court. Further, as he was currently out of disciplinary lockup, the issue was moot. (Id. ¶ 29.)

Faulkingham responds by setting forth the witnesses he can call that could testify to the struggle he had gaining access to the phone while in administrative and disciplinary segregation. (Faulkingham Aff. ¶ 26.) One fellow inmate, who was in "the Hole" with Faulkingham until May 27, 2004, and became Faulkingham's J Block mate thereafter, would testify that he had made a call on Faulkingham's behalf on June 9, 2004. (Id. Ex. 1-1.) This individual would also testify that he witnessed Faulkingham call his lawyer on May 27, 2004, and observed Faulkingham write a grievance asking for more time to call his lawyer. (Id.) However, this witness opines, the answer was always no, with no reason given. (Id.) Faulkingham also cites to a statement by another inmate who indicates that he was placed in lock-up for disciplinary write-ups and that on March 2, 2004, he asked for and was granted a fifteen-minute call to his lawyer. (Id.) Faulkingham urges that as a pre-trial detainee he needed access to the phone, citing his criminal cases in Hancock County. (Faulkingham Aff. ¶ 27.) He faults the defendants for not providing the phone log to which they refer, suggesting that they have fictionalized their story. (Id. ¶¶ 27, 28.) With respect to his June 16, 2004, grievance, Faulkingham explains that he could not write to a lawyer that he did not have apropos his criminal charges in Hancock County and that he also needed an attorney for his civil

case.  (<u>Id.</u> ¶ 29.)   He disputes Gordon's assertion that forbidding inmates in disciplinary lockup phone access is constitutional.  (<u>Id.</u>)

The defendants represent that on June 18, 2004, Faulkingham (who was placed back in disciplinary segregation on June 17, 2004) filed a grievance regarding obtaining witness statements from his disciplinary board hearing.  The grievance response indicated that Faulkingham had all the copies of the reports and the statements were contained on the reports and further promising that his hearing would be fair and impartial.  (Defs.' SMF ¶ 30.)

Faulkingham responds that he filed several grievances concerning why he was on administrative segregation.  (Faulkingham Aff. ¶ 30.)  He states that the June 18, 2004, grievance was written shortly after he had served the disciplinary charge.  (<u>Id.</u>)  He requested a statement from all involved in the alleged offense because he had not been given anything pertaining to the charge.  (<u>Id.</u>)  At the hearing no descriptive statement was made; reference was made only to the charge.  (<u>Id.</u>)  The alleged victim made a statement that Faulkingham did not see.  Correctional Officer Hatch made a statement which was given to Faulkingham.  (<u>Id.</u>)  Faulkingham states that he has requested documents pertaining to all his disciplinary charges and had not been given any support for the charge other than the Hatch statement.  (<u>Id.</u>)  Faulkingham argues that the hearing was not fair or impartial.  (<u>Id.</u>)  He notes that the response to his grievances, indicating that he had copies of the reports and the statements, is false as nothing was given to him. (<u>Id.</u>; Defs.' Ex. 26.)

According to the defendants, on June 18, 2004, Faulkingham submitted a grievance indicating that during the night he received a legal envelope, and when he got it

there was no letter, just an envelope.  Sergeant Basso initially responded to the grievance indicating that although he did not remember any mail coming in for Faulkingham that night, the procedure is that legal mail is sent upstairs unopened and opened in front of the inmate during waking hours.  Upon administrative review, Ty Babb also responded that he had spoken with staff that worked that evening, no legal mail had been delivered to the inmates that night, as they did not receive mail until late, and Faulkingham's mail was not given to him because he was sleeping.  Babb concluded that he could not substantiate Faulkingham's allegation.  (Defs.' SMF ¶ 31.)

Faulkingham directs the court to the defendants' Exhibit 28, a memo from Correctional Officer Libby to Sergeant Basso.  In that memo Libby indicates:

> On [June 17, 2004] I was assigned to 2 South, Inmate Faulkingham David had some attorney mail sent up from down stairs.  It was unopened and remained that way through the rest of my tour.  It was after midnight when the mail came up so I did not wake him so he could open it in front of me.  I placed the unopened legal mail in the 2 South duty station mail box.  I was relieved by C/O Ryan Hatch at 0700 hrs I told him that the mail was the[re] to hand out when Mr. Faulkingham awakes.  This is all my involvement in matter.

(Defs.' SMF Ex. 28.)  Faulkingham next calls the court's attention to the memorandum from Ryan Hatch to Sergeant Boulier describing his involvement in this situation.  Hatch writes:

> On 6-18-04 I was serving chow in 2-South when I went to open inmate [F]aulkingham, David # 112767 cell since he was in lock-up.  He approached me with a legal envelope that had already been open[ed] with the date ripped off.  He told me that it had been slid under his door that night.  I told him he needed to talk with that officer or file a grievance.  I went back to Mr. [F]aulkingham's cell later on [and] he had a grievance for me.  This is all my involvement in this matter.

(Id. Ex. 29.)  Finally, Faulkingham points out that Assistant Jail Administrator Ty Babb noted in his administrative review of the June 18, 2004, grievance:

> As far as your allegations about your legal mail, I have spoken
> with staff that worked the evening in question, and [they] state your legal
> mail had not been delivered to you that night because they didn't receive[]
> mail until late.  And they state they never gave it to you because you were
> sleeping, which contradicts what your are cla[i]ming about receiving
> under your door.  I cannot substantiate your allegation.

(Id. Ex. 27.)  Faulkingham wonders how Babb could not see that he received the

envelope during sleeping hours and that Libby and Hatch (Hatch is a defendant in one of

Faulkingham's other civil cases) were the only individuals involved and that Hatch had

motivation to retaliate against Faulkingham.  (Faulkingham Aff. ¶ 31.)

The defendants state that on June 22, 2004, Faulkingham filed a grievance

pertaining to why he was still in administrative lockup.  In response, Sergeant Boulier

indicated it was his understanding that Faulkingham may have been involved in another

altercation on June 21, 2004, at recreation, and advised that this issue was currently being

addressed and evidence seemed to suggest Faulkingham's involvement.  This, coupled

with the assault on inmate Thayer, and a rash of recent write-ups, one for threatening

Corrections Officer Florey, was the reason provided for continuing to hold Faulkingham

in administrative lockup.  (Defs.' SMF ¶ 32.)

Faulkingham replies that he also was asking for access to the courts by phone,

mail, legal books, and other supplies which were taken from Faulkingham.

(Faulkingham Aff. ¶ 32; Defs.' Ex. 30.)  With respect to his involvement in another fight,

Faulkingham states that he was never charged and asks the defendants to produce any

documents pertaining to him being charged with a second fight.  (Faulkingham Aff.

¶ 32.)

According to the defendants, on June 22, 2004, Faulkingham filed an inmate

request indicating that he had a lot to do for his lawsuits, and that he wanted to get out of

administrative lockup.  This request was responded to with an indication that

Faulkingham's administrative lockup was reviewed by classification on June 22, 2004,

and that they had recommended he remain in administrative lockup because of two recent

fights with other inmates and other major write-ups.  (Defs.' SMF ¶ 33.)  On June 23,

2004, Faulkingham filed a grievance pertaining to his placement in administrative lockup

and a conversation he had with Babb regarding his remaining in administrative lockup.

Babb responded to this grievance indicating that he had answered Faulkingham's

questions and told him why his administrative lockup status was continued and that

Faulkingham would be served with his discipline papers on June 24, 2004.  (Defs.' SMF

¶ 34.)  On June 24, 2004, Faulkingham filed a grievance indicating that he was being

deprived of his constitutional right to legal material, to wit, law books.  Babb responded

by indicating that he had spoken with Sergeant Slowik, and that Slowik would ensure that

Faulkingham received all his legal paperwork and books out of his property box.  Babb

also reiterated the pending charges for fighting and threatening a corrections officer.

(Defs.' SMF ¶ 35.)

Faulkingham responds that he filed this June 22, 2004, grievance because he still

had not been charged or seen anything pertaining to the write-up.  (Faulkingham Aff.

¶ 33.)  He states that he had been in lock-up for twenty days waiting for the write-up, a

disciplinary hearing, or a clearance of the "trumped up" charge.  (Id.)  Despite the

absence of charges, he complains that he still had no legal books, no phone calls, no visits

with family, and his mail had been disrupted.  (Id.)  Furthermore he had an injury to his

shoulder and was not receiving treatment for it.  (Id.)  With respect to the June 23, 2004,

grievance he questioned why after two days he had still not been given a written

explanation or disciplinary write-up.  (Id. ¶ 34.)  Babb, Faulkingham points out,

represented that he would write it up on June 24, 2004, but – because according to

Faulkingham he had done nothing wrong -- this memorialization never materialized.

(Id.)  Faulkingham points to Golden's response to his July 7, 2004, grievance in which

she indicates:

> You were placed in Admin Seg on 6/17 for assaulting another
> inmate.  When the incident occurred in the rec yard on 6/21 you were
> already in Admin Seg.  The writeup never made it to the D Board.  Your
> behavior has caused you to lose access to many things not the jail or the
> staff.

(Defs.' SMF Ex. 35.)  And, as to the June 24, 2004, grievance, Faulkingham explains that

he wanted his law book, legal documents, and briefs, and that he had a constitutional

right to all these things.  (Faulkingham Aff. ¶ 34.)  However, he never got his stuff back

from when he went into "the Hole" on May 22, 2004, and, again, on June 17, 2004.  (Id.)

Faulkingham faults Babb for his two false assurances that he would receive his property

and would receive a written write-up.  (Id.)

There is no dispute that on July 1, 2004, Faulkingham filled out a request

regarding making phone calls during clean-up, and requesting a ten minute lawyer phone

call. Golden responded indicating that the phone is a privilege and that inmates in lockup

do not have access to the phone unless authorized based on a bona fide reason. According

to Golden, lawyer calls do not constitute a bona fide reason and Faulkingham's solution

to this issue was to follow the rules and stay out of lockup.  (Defs.' SMF ¶ 36.)[12]

According to the defendants, on July 7, 2004, Faulkingham filed a grievance

complaining that his mail was being disrupted, that his legal mail was being opened, and

---

[12]     Faulkingham's response to this statement is an argument that he had a constitutional right to use the phone, despite Golden's opinion to the contrary.

that the jail was not putting proper postage on outgoing mail.  The grievance was responded to by Corporal Gardner indicating that any indigent mail received by programs is stamped and brought to intake to be mailed out that night.  Any overstuffed envelopes are weighed and stamped accordingly.  Golden provided administrative review of this grievance, noting that Faulkingham was placed in administrative segregation on June 17, 2004, for assaulting another inmate.  Subsequently, Faulkingham was involved in another inmate altercation, and it was his behavior (and not the jail's or the staff's), Golden pointed out, that has caused Faulkingham to lose access to many things.  (Defs.' SMF ¶ 37.)

According to Faulkingham, a large legal envelope of his was sent out in the indigent mail and thirteen days later he received this envelope back.  (Faulkingham Aff. ¶ 37.)  He states that it had been returned to the jail three times over the thirteen-day period and three times it was stamped by the post office in large red letters RETURNED FOR POSTAGE DUE.  (Id.)  He complains that this was not the first time that his mail was returned for insufficient postage, citing the May 4, 2004, grievance on this topic. (Id.; Defs.' SMF Ex. 5.)  Faulkingham is suspicious of the fact that this happened more than once to his legal mail, at a time when he had no phone privileges and no right to law books or legal assistance.  Faulkingham also grieved that he was losing legal belongings when he was placed in "the Hole."  Yet Golden, Faulkingham complains, only addressed the fact that his charge were dropped and ignored his complaints about the mail problems or property loss.  (Faulkingham Aff. ¶ 37.)  Faulkingham thinks he was held in administrative segregation just long enough for the defendants to steal all his property. (Id.)

There is no dispute that on July 13, 2004, Faulkingham filed a grievance indicating that he received his mail that morning marked July 9, 2003, and that mail should have been delivered to him the day before, Monday, July 12, 2004. This grievance was responded to by indicating that mail is not delivered to the jail on weekends, and it was delivered on Monday. It was sorted Monday night and was delivered to him Tuesday morning. (Defs.' SMF ¶ 38.) On July 13, three hours after filing a grievance on the same topic, Faulkingham filed an inmate request form asking why his legal mail had been held up again. The request was responded to indicating that if the letter was postmarked on July 9, 2004, then the first day it could have been delivered was Saturday, July 10, 2004. Since the facility did not receive mail on that date, it was delivered on Monday. Faulkingham received the mail by the next business day, Tuesday, July 13, 2004, in compliance with jail standards. (Mail from a medical facility is not legal mail and was opened and searched.) (Id. ¶ 39.)[13]

There is also no dispute that on July 15, 2004, Faulkingham filed a grievance complaining about the rules pertaining to inmates who were "not in good standing," and claiming that the rules were very vague. In this grievance Faulkingham went on to complain about not being able to make lawyer calls. Golden responded to the grievance indicating that for purposes of that section of the rules, a bona fide reason would be along the lines of a family emergency, meaning death or hospitalization of a loved one. (Defs.' SMF ¶ 40.)

---

[13]     Faulkingham does not dispute this factual statement but points out that when mail is one's only way to communicate with the court and an inmate is on a deadline to get documents to the court or a lawyer, then the inmate has a limited four-day window. (Faulkingham Aff. ¶ 39.) Also, Faulkingham could not call his lawyer so Faulkingham was dependent on the jail to do its job and properly stamp the mail. He sees this coincidence of insufficient postage as further evidence of a conspiracy.

According to the defendants, the Penobscot County Jail, by policy, allows pretrial inmates to complete two unmonitored collect phone calls as part of the admissions process.  In addition, Faulkingham, when he was an inmate in good standing, would have had access to the collect phone calls located in the day room of his cell block up.  (Defs.' SMF ¶ 41.)  Once an inmate is not in good standing, meaning that they are in disciplinary or administrative segregation, they are not allowed to use the collect call phones located in the jail block day room unless authorized by a shift supervisor or designee for a bona fide reason.  Under the policy routine lawyer calls do not constitute a bona fide reason. (Id. ¶ 42.) [14]

The defendants state that additional restrictions are placed on inmates in the Penobscot County Jail who are in disciplinary segregation in that they are not allowed commissary privileges. As a result, inmates in disciplinary segregation are provided with writing supplies and postage to send three personal, first class letters per week.  Inmates in disciplinary segregation, however, are provided with unlimited writing supplies and postage for the purposes of correspondence with attorneys, courts, and grievance review representatives.  (Id. ¶ 43.)  However Faulkingham replies that everything was taken from him when he was placed in administrative segregation, including his stamps, his legal books, his legal mail, a notepad, a pen, and a pencil.  (Id.; Ex. 5-4.)  He asks how he could communicate with the court given this confiscation.  (Faulkingham Aff. ¶ 43.)

According to the defendants, inmates held in disciplinary segregation or administrative segregation are not limited with respect to visitation by their attorneys. As there are no restrictions on attorney's visits, other than they not occur when the inmate is

---

[14]    Faulkingham states that inmates in administrative segregation are under different rules than when they are being disciplined and, as he was a pretrial detainee, he was on a different footing than convicted inmates.  (Faulkingham Aff. ¶¶ 41, 42.)

sleeping, eating or during formal headcount, Faulkingham could have had as many attorney visits as he and his attorneys chose to conduct.  (Id. ¶ 44.)  Faulkingham retorts that that is all well and good if you have a lawyer, but a visit from a lawyer that you do not have does not do an inmate much good.  (Faulkingham Aff. ¶ 44.)

### Faulkingham's Access to Courts Claims

The defendants, understandably, complain that the contours of Faulkingham's legal claims are not so easy to identify.  The defendants have briefed a denial of access to the court claim based on the jail's policy of limiting phone access for inmates not in good standing/in disciplinary segregation and a conspiracy claim under 42 U.S.C. § 1985 (the statute referenced by Faulkingham in his amended complaint).  In his "Declaration in Opposition to Defendants' Motion for Summary Judgment" Faulkingham identifies four "points" which it is fair to interpret, in view of the facts discussed and the case law cited, as setting forth four claims arising from the above facts.[15]   As to all four points, Faulkingham complains that the defendants' policy or conduct interfered with his access to the courts.

### Limitation on Phone Access, Insufficient Library Resources, Mail Mishandling, and Property Confiscation as Punishment

With respect to the prohibition against using a condition or restriction to punish a pre-trial detainee for the as yet unproven criminal conduct leading to the detention:

> if a particular condition or restriction of pretrial detention is reasonably
> related to a legitimate governmental objective, it does not, without more,
> amount to "punishment." Conversely, if a restriction or condition is not

---

[15]    These four claims are found in the Brief in support of the response to defendants' motion for summary judgment (Docket No. 38) at pp. 9 – 23.  As I interpret his four claims, Faulkingham's "points" are: (1) he was denied phone privileges for 90 days; (2) the law library did not provide adequate research materials; (3) his legal mail was mishandled; and (4) the corrections officers retaliated against him for exercising his constitutional right to bring lawsuits by placing him in administrative segregation, taking away his legal documents and other property, mishandling his mail, and denying him phone and library privileges.

> reasonably related to a legitimate goal--if it is arbitrary or purposeless--a
> court permissibly may infer that the purpose of the governmental action is
> punishment that may not constitutionally be inflicted upon detainees qua
> detainees.

Bell v. Wolfish, 441 U.S. 520, 539 (1979) (footnote omitted).

The defendants take the position that once an inmate is not in good standing,
meaning that they are in disciplinary or administrative segregation, they are not allowed
to use the collect call phones located in the jail block day room unless authorized by a
shift supervisor or designee for a bona fide reason and that routine lawyer calls do not
constitute a bona fide reason.  They address the claim purely under the Bell inquiry.

I previously addressed a similar challenge to the Penobscot County Jail's phone
access policy in Simpson v. Gallant, 223 F. Supp. 2d 286, 296 -97 (D. Me. 2002),
analyzing that plaintiff's claims under Bell v. Wolfish, 441 U.S. 520 (1979).  I noted, "I
must gauge whether the restriction or condition was "reasonably related to a legitimate
goal" or, conversely, whether it was "arbitrary or purposeless."  223 F. Supp. 2d at 297
(quoting Bell, 441 U.S. at 539).

The defendants rely on the First Circuit's  Collazo-Leon v. United States Bureau
of Prisons, a case brought by a pre-trial detainee who, as a disciplinary sanction, was
subjected to ninety-day segregation with no telephone and visitation privileges.  51 F.3d
315 (1st Cir. 1995).  The Panel reflected:

> On the authority of Bell, it may be divined that even if a
> restriction or condition may be viewed as having a punitive effect on the
> pretrial detainee, it is nonetheless constitutional if it also furthers some
> legitimate governmental objective such as addressing a specific
> institutional violation and is not excessive in light of the seriousness of the
> violation. Bell, 441 U.S. at 538-39; Youngberg v. Romeo, 457 U.S. 307,
> 320(1982) (requiring that restrictions on the liberty of an involuntarily
> confined mental patient be reasonably related to legitimate government
> interests in imposing those restrictions). Among the legitimate objectives

>recognized by the Supreme Court are ensuring a detainee's presence at
>trial and maintaining safety, internal order, and security within the
>institution. Bell, 441 U.S. at 540. If there is a reasonable relation between
>the sanctions and legitimate institutional policies, an intent to punish the
>detainee for prior unproven criminal conduct cannot be inferred.
>Accordingly, this Court must determine whether the punishment imposed
>here was incident to some legitimate governmental purpose.

Id. at 318. While the record before me is fertile with evidence that the defendants

stripped Faulkingham of his phone privileges due to his disciplinary infractions as a

detainee, there is no record evidence from which I can infer that they did this with the

intent to punish Faulkingham for his pre-detention unproven criminal conduct. The same

is true with respect to incidents with the library, mail, and property confiscation; if the

defendants were in anyway punishing Faulkingham by dragging their feet on library

requests, affixing insufficient postage to his mail, delaying delivering of his incoming

mail, opening legal mail outside his presence, or confiscating his legal papers and other

property, then, on Faulkingham's own version of events, this was due to his conduct as a

detainee and not his pre-incarceration activity. There is no evidence in this record of an

intent to punish Faulkingham for prior unproven criminal conduct.

### *Limitation on Phone Access, Insufficient Library Resources, Mail Mishandling, and Property Confiscation apropos Denial of Access to Court*

My conclusion that the defendants' actions were not an impermissible punishment

of Faulkingham for pre-detention conduct, does not end the factual allegations pertaining

to lawyer calls, mail, library, and legal material confiscation. The facts must still be

analyzed with respect to the whether or not the Penobscot County Jail's policy/practice of

barring segregated detainees from making routine phone calls to an attorney -- even

though not implemented with a intent to punish for prior unproven criminal conduct --

impermissibly infringes the detainee's right to have access to a lawyer and the courts.

Although left unmentioned by the defendants, the <u>Collazo-Leon</u> Panel noted that the loss of telephone and visiting privileges did not include "any restriction of those activities which involve communication with [the plaintiff's] attorneys." <u>Id.</u> at 316 n.1.  And in <u>Simpson</u> I cautioned that although Simpson's facts did not amount to a constitutional claim, that "given the right set of facts, [the Jail] could find itself confronting a deprivation of constitutional significance if its staff failed to take care to recognize the bona fide nature of bail requests, separate and distinct from routine contact with counsel." 223 F.Supp.2d at 296.

It is beyond dispute that inmates have a constitutional right of access to the courts. <u>Bounds v. Smith</u> 430 U.S. 817, 828 (1977).  The Penobscot County Jail has an obligation to "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." <u>Id.</u> at  828. However, an inmate advancing such a claim must demonstrate "that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim" as "prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " <u>Lewis v. Casey</u>, 518 U.S. 343, 351 (1996) (quoting <u>Bounds</u>, 430 U.S. at 825).   While <u>Casey</u> addressed claims that the law library and legal assistance did not meet the inmate's needs, Courts addressing denial of access claims involving mail practices have concluded that the actual injury requirement is applicable to such claims. In <u>Oliver v. Fauver</u>, 118 F.3d 175 (3d Cir. 1997).

Accordingly, Faulkingham must demonstrate that a non-frivolous legal claim was frustrated or impeded by the policies and practices of the Penobscot County Jail authorities.  Id. at 353; see also Christopher v. Harbury, 536 U.S. 403, 413-15 (2002) (holding that the right of access is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court").  Faulkingham, who has now been sentenced on federal charges, is not claiming that "official action, by the Penobscot County Jail, 'is presently denying [him] an opportunity to litigate' Harbury, 536 at 413, so he must claim that there are 'specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future.'" Id. at 413-14.  Apropos this variation of denial of access to court claim, "the official acts claimed to have denied access may allegedly have caused the loss or inadequate settlement of a meritorious case or the loss of an opportunity to seek some particular order of relief."  Id. at 414.  Such claims look "backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable."  Id. (footnotes omitted).

Importantly for Faulkingham:

It follows, too, that when the access claim (like this one) looks backward, the complaint must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought. There is, after all, no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element.

Id. at 415.  "Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant."  Id. at 416 (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513-15 (2002)).  Even if this case were still at a motion to dismiss stage,

31

> the predicate claim be described well enough to apply the "nonfrivolous"
> test and to show that the "arguable" nature of the underlying claim is more
> than hope. And because these backward-looking cases are brought to get
> relief unobtainable in other suits, the remedy sought must itself be
> identified to hedge against the risk that an access claim be tried all the way
> through, only to find that the court can award no remedy that the plaintiff
> could not have been awarded on a presently existing claim.

Id. (footnote omitted).

According to Faulkingham he had six criminal matters and, by the end of his stay at the Penobscot County Jail, six civil matters pending in courts.  His most serious claim is that, as a result of the denial of access to the phone while in segregation, he was unable to arrange for an attorney to represent him in the criminal matters he faced in Hancock County.  Even though this case has now advanced to the summary judgment stage, nowhere has Faulkingham identified what these criminal matters were, whether he had a right to court appointed representation as an indigent defendant, and what the resolution (if any) of those matters was.  He has made no showing how his denial of access to a phone to call an attorney had any appreciable effect on the outcome of those six criminal cases.

Faulkingham also argues that he wanted to get a lawyer to represent him in one or more of his civil matters.  I am quite familiar with Faulkingham's civil cases filed in the District of Maine.  Faulkingham filed a case against various state agencies on April 14, 2004, which was during his time at the Penobscot County Jail, Civ. No. 04-57-B-W, which was dismissed because the agencies were not amendable to suit. With respect to his time at the Penobscot County Jail Faulkingham has a suit still pending, Civ. No. 04-48-B-K, complaining mainly about medical care at the jail, that was only at the issuance of subpoena phase when Faulkingham was transferred from the Penobscot County Jail.

He also had a case pending against medical personnel at the jail concerning his medical care, Civ. No. 04-105-B-W, which was at the application to proceed in forma pauperis/intend to proceed stage when Faulkingham was transferred and which was consolidated with Civil Number 04-48-B-K.  Faulkingham filed three suits about his detainment at the Penobscot County Jail on July 12, 2004, Civil Nos. 04-114-B-W, 04-115-B-W & 04-116-B-W, and on July 12, 2004, I entered an order denying Faulkingham leave to proceed in forma pauperis because Faulkingham's continuous filing of complaints was becoming unjustifiably burdensome on the Court.  At that time I indicated that he was free to move to amend his pending actions.  Faulkingham did not pay the fee for this trio of cases.  First, after Faulkingham's transfer in July 2004, these defendants did not in anyway have an impact on Faulkingham's access to court (e.g., his ability to hire a lawyer) in these civil complaints that were all at a stage that a lawyer could yet make an appearance on his behalf.  Second, Faulkingham is still pursuing his relief on the underlying claims and I cannot fathom what remedy he seeks from this suit against these defendants.[16]  Accordingly, under Harbury I concluded that Faulkingham cannot press his access to court claim.[17]

---

[16]     As best as I can tell, the legal papers that allegedly were confiscated from Faulkingham pertained to his criminal cases.

[17]     Even if a prison regulation, policy or practice hinders an inmate's constitutional right, such as his or her ability to access the courts, it may be upheld if what is challenged bears a rational relationship to legitimate penological interests. See Overton v. Bazzetta, 539 U.S. 126, 132 (2003). The Supreme Court has held that:

> four factors are relevant in deciding whether a prison regulation affecting a constitutional right that survives incarceration withstands constitutional challenge: whether the regulation has a " 'valid, rational connection' " to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are "ready alternatives" to the regulation.

Id. at 132 (quoting Turner v. Safety, 482 U.S. 78, 89-91 (1987)).  "The burden, moreover, is not on the [defendant] to prove the validity of prison regulations but on the prisoner to disprove it."  Id.

***Limitation on Phone Access, Insufficient Library Resources, Mail Mishandling, and
Property Confiscation apropos a Retaliatory Conspiracy***

This aspect of Faulkingham's lawsuit presents as the most problematical. The
defendants quite reasonably initially briefed the issue under 18 U.S.C. § 1985 because
that is the statutory reference in Faulkingham's amended complaint dealing with a
"conspiracy". In his reply brief Faulkingham explains that he is actually alleging a
retaliatory conspiracy under Section 1983, undertaken by jail personnel to deprive him of
his rights because he had filed numerous lawsuits against the Penobscot County Jail and
its personnel. I agree with the defendants that this claim is a newly articulated one, not
directly raised in the initial amended complaint.

The claim seems to have two components. First, Faulkingham now claims he was
placed in administrative segregation solely because of his litigation related activities.
This claim is a nonstarter because nowhere in the voluminous grievances filed by
Faulkingham or in the record evidence submitted to this court  is there any evidence that
Faulkingham was ever placed in administrative segregation for any reason other than
threatening an officer or possibly fighting with other inmates. Whatever reasons underlie
his placement in administrative segregation, Faulkingham cannot attempt to challenge the
status for the first time in his response to the defendants' motion for summary judgment.
At this juncture the case cannot be transformed from a denial of access to the courts claim
into a new case, alleging that Faulkingham was wrongfully placed on administrative
segregation because of the retaliatory intent of the corrections officers. If he had
intended to bring that claim, it should have been raised earlier, in the amended complaint
and at the administrative level. Faulkingham's amended complaint, no matter how
liberally construed, would, at best, have put the defendants on notice that the

34

administrative segregation policies were unconstitutionally restrictive, not that he was on administrative segregation as the result of a retaliatory conspiracy.

The second component of this retaliation claim appears to be Faulkingham's contention that while he was held in administrative segregation in addition to suffering the deprivations attendant to disciplinary segregation, certain jail personnel also deliberately confiscated his property, most notably legal papers from his criminal cases in Hancock County, deliberately withheld law books from him, and deliberately mishandled his mail, not merely because of his administrative status, but also in retaliation for his pending lawsuits.   This aspect of the claim is at least suggested in the amended complaint.   Under controlling Supreme Court precedent there is no heightened evidentiary standard that an inmate must meet to prove that prison officials acted with a malicious intent.  Crawford-El v. Britton, 523 U.S. 574 (1998) (allowing suit to proceed where inmate alleged that officials intentionally mishandled boxes containing legal materials and personal belongings).   Nor does this sort of claim of retaliatory action by an individual state actor require an inmate to prove any actual injury.  Nei v. Dooley, 372 F.3d 1003, 1007 -1008 (8th Cir. 2004) ("To be actionable, the retaliatory conduct itself need not be unconstitutional because the constitutional violation lies in the intent to impede access to the courts.")   Certainly at the motion to dismiss stage, this type of claim cannot be dismissed as frivolous.  Westbrook v. Treon 78 Fed.Appx. 970, 972, 2003 WL 22430517, **1 (5th Cir. 2003) ("Westbrook also alleges that he was denied access to legal materials in retaliation for filing grievances. As he has alleged a "chronology of events from which retaliation may plausibly be inferred," he has presented a colorable claim under 42 U.S.C. § 1983.")

Faulkingham's retaliation claim falters not because of legal deficiencies in his pleading, but because of the failure of his record evidence to support his contentions. Now, at the summary judgment stage, Faulkingham must do something more than merely set forth allegations from which the retaliatory intent could be inferred. He has to develop a factual record *as to specific defendants*, supporting his allegations. According Faulkingham due deference as a pro se litigant, but operating within the constraints of Local Rule 56, Faulkingham's evidentiary support is limited to the exhibits he has offered as explained within the context of the forty-four paragraph affidavit he has filed in response to defendants' forty-four paragraph statement of material facts.

While Faulkingham attempts to qualify and in some cases deny the statements of fact put forth by defendants, his evidentiary showing does not put forth a pattern of retaliatory acts by any of the named defendants. When he does address individual named defendants as involved in a retaliatory conspiracy, it is only in the most general and conclusory of ways, e.g. ¶ 21 ("Golden still states different. I would say this statement is not true as Lt. Golden is part of the conspiracy to retaliate.") Defendants' paragraph 21, citing as record support the Clukey Affidiavit, ¶ 24, stated that Golden had responded to Faulkingham's May 23, 2004, grievance by telling him that he had been placed on administrative segregation for threatening an officer. Faulkingham's "evidence" does nothing to further the notion that Golden was part of any conspiracy to retaliate. In the preceding paragraph the defendants set forth the threat Faulkingham allegedly made. While Faulkingham makes a lengthy response to that paragraph he never explicitly denies verbally confronting Corrections Officer Cain with obscenities and threatening to kill him. He only says he was upset with Cain when he moved him to the holding cell and

that Cain and Sgt. Boulier "made up a reason to do what had already been done."  The whole dispute seems be over the fact that Faulkingham was initially moved because of space problems, but, upset over the move, he became verbally abusive to the officer. Faulkingham's qualification provides no evidence to refute defendants' version of events. The officers "retaliated" against Faulkingham because he shouted obscenities and threatened to kill one of them.

I am simply not persuaded that Faulkingham's summary judgment record puts forth evidence of significant retaliatory actions taken by any of the named defendants. The truth of the matter, gleaned from this court's own docket, demonstrates that Faulkingham had virtually continuous access to the courts and the ability to conduct abundant legal research.  While the case law suggests that Faulkingham does not have to prove that he actually suffered harm in regard to his litigation posture when his claim is framed as a retaliation complaint, he does have to show the named defendant retaliated against him in some significant way because of Faulkingham's exercise of his First Amendment or other constitutional rights.  He has presented no evidence to support such an allegation.

### Conclusion

Based upon the foregoing I recommend that the court **GRANT** the defendants' motion for summary judgment.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum,

within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated June 17, 2005